# **Exhibit E**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ELIJAH IDRIS,                        )
                                     )
          Plaintiff,                 )
                                     )
     vs.                             )   No. 12 CV 06271
                                     )
OFFICER JOHN CONWAY, STAR NO.        )
9524, OFFICER WILLIAM MORIARTY,      )
STAR NO. 6313 and the CITY OF        )
CHICAGO,                             )
                                     )
          Defendants.                )


          The deposition of JOHN CONWAY taken before

Trixie L. Schuzer, Certified Shorthand Reporter and

Notary Public, taken pursuant to the provisions of

the Illinois Code of Civil Procedure and the Rules

of the Supreme Court thereof pertaining to the

taking of depositions for the purpose of discovery

at 300 West Adams Street, Suite 330, Chicago,

Illinois, commencing at 10:08 a.m. on the 21st day

of February, A.D., 2013.

```
 1   APPEARANCES:

 2           ED FOX AND ASSOCIATES
             MR. JONATHAN R. KSIAZEK
 3           300 West Adams Street
             Suite 330
 4           Chicago, Illinois 60606
             Phone: (312) 345-8877
 5           Email: jksiazek@efox-law.com

 6                   On behalf of the Plaintiff;

 7           CITY OF CHICAGO DEPARTMENT OF LAW
             MS. KRISTIN ACUFF
 8           30 North LaSalle Street
             Suite 900
 9           Chicago, Illinois 60602
             Phone: (312) 742-7035
10           Email: kristin.acuff@cityofchicago.org

11                   On behalf of the Defendants;

12   ALSO PRESENT: Officer William Moriarty.

13                   *   *   *   *   *   *

14

15

16

17

18

19

20

21

22

23

24
```

```
 1                    I N D E X

 2

 3  WITNESS                              PAGE

 4  JOHN CONWAY

 5      Examination by Mr. Ksiazek..........   4

 6      Examination by Ms. Acuff........... 115

 7

 8                  E X H I B I T S

 9  PLAINTIFF'S EXHIBITS                 PAGE

10  No. 1                                 91

11  No. 2                                 99

12  No. 3                                103

13  No. 4                                104

14  No. 5                                108

15

16

17

18

19

20

21

22

23

24
```

1                    (Witness sworn.)

2    WHEREUPON:

3                        JOHN CONWAY,

4    called as a witness herein, having been first duly

5    sworn, was examined and testified as follows:

6                        EXAMINATION

7    BY MR. KSIAZEK:

8        Q.    Good morning.   Can you please state and

9    spell your name for the record?

10       A.    Good morning.   John Conway, C-O-N-W-A-Y,

11   Star 9524.

12           MR. KSIAZEK:   For the record this is the

13   deposition of Officer John Conway taken in the case

14   of Elijah Idris v. Conway et al.   Case number 12 CV

15   6271.   The deposition is being taken by all

16   applicable federal and local rules and pursuant to

17   notice and agreement between the parties.

18   BY MR. KSIAZEK:

19       Q.    Officer Conway, have you ever given a

20   deposition before?

21       A.    Yes.

22       Q.    When was the last time?

23       A.    Approximately a year ago.

24       Q.    All right.   You may be familiar with some

JENSEN REPORTING (312) 236-6936

1    Q.    The Harold Washington courses, are you

2    still pursuing a degree at Harold Washington?

3    A.    No.

4    Q.    Were those through the department?

5    A.    No.

6    Q.    Okay.  What was the reason why you took

7    those classes?

8    A.    So I could -- if I scored well on a

9    promotional exam, I'd have my associate's to be

10   promoted to the rank of sergeant.

11   Q.    Did you obtain your associate's?

12   A.    No.

13   Q.    How long have you worked for the City of

14   Chicago as a police officer?

15   A.    18 and a half years.

16   Q.    Which meant you started when?

17   A.    September 6, 1994.

18   Q.    In between 1989 and 1994, did you have any

19   other employment?

20   A.    Yes.

21   Q.    Where did you work?

22   A.    I worked at Essence the electric company

23   from 1990 to '94.

24   Q.    What was your title?

1    A.    I was a mail room clerk for two years and

2  a factory worker on an assembly for two years.

3    Q.    And you left that position to become a

4  police officer?

5    A.    Correct.

6    Q.    Have you ever worked for any other police

7  departments besides the City of Chicago?

8    A.    No.

9    Q.    Have you ever served in the military

10 before?

11   A.    No.

12   Q.    Can you tell me what your height and

13 weight is as you sit here today?

14   A.    Today I'm six feet tall and approximately

15 195 pounds.

16   Q.    Is that approximately the same height and

17 weight that you had in January 2012?

18   A.    Approximately.  I'm probably five pounds

19 less.

20   Q.    And how old are you?

21   A.    42.

22   Q.    What is your current assignment?

23   A.    I'm a patrolman working at Unit 050 which

24 is O'Hare airport north.

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 8 of 95 PageID #:205

1      Q.    How long have you had that assignment?

2      A.    Since January of this year.

3      Q.    January 2013?

4      A.    No, I'm sorry.  I have been on days since

5   January of this year.  Prior to that I've been at

6   the airport since 2010.

7      Q.    And January of this year is when you

8   switched to days?

9      A.    Correct.

10      Q.    What were you working prior to January of

11   this year?

12      A.    I was on a third-watch tact team.

13      Q.    Still at the airport?

14      A.    Correct.

15      Q.    What are the hours of third watch at

16   O'Hare airport?

17      A.    2:00 p.m. to 11:00 p.m.

18      Q.    What are your duties currently as a

19   patrolman assigned to unit 050?

20      A.    Answer calls, traffic assignments,

21   hospitalization reports, lost property reports,

22   weapons, violation at TSA checkpoints.

23      Q.    Do you work with a partner?

24      A.    No.

1    Q.   Do you have a vehicle in your current

2   assignment?

3    A.   Some days I do, some days I don't.

4    Q.   Then when you worked on the tactical team,

5   that was from November 2010 to January of this year;

6   is that right?

7    A.   Correct.

8    Q.   What were your duties when you were

9   assigned to the tactical team?

10    A.   To patrol the different areas of the

11   airport, the non secure sides, upper level, lower

12   level, parking garage, walkways to and from the

13   parking garage, the CTA.

14    Q.   What -- did you work with a partner at

15   that time?

16    A.   Yes.

17    Q.   Who was your partner?

18    A.   Officer Mike O'Niell, O-N-I-E-L-L.

19    Q.   Were you assigned to a specific beat

20   during that time period?

21    A.   I was 7263 boy, I believe.

22    Q.   When you say patrol the airport, is that

23   on foot or is that in a vehicle or does it change

24   from day-to-day?

1      Q.  You were working beat 7263B that day; is

2  that right?

3      A.  I don't recall what I actually was on on

4  the worksheets but I was working with Officer

5  Moriarty.  If they called 63 boy we'd answer up with

6  that or as charlie.

7      Q.  Were you on some type of baggage mission

8  that day?

9      A.  Yes.

10     Q.  Can you describe what the baggage mission

11  was?

12     A.  Due to thefts that occur in the baggage

13  area at O'Hare area, we'll sit in the baggage claim

14  area and observe passengers come and go.  People

15  coming in and out and just looking for somebody

16  taking bags off the carousel.  That's about it.

17     Q.  And is that what your assignment was on

18  that day?

19     A.  I don't know if we had an outright mission

20  or if we had started at that particular time.  I

21  don't know if there was an alert that this specific

22  -- that thefts were up in one terminal.  I don't

23  recall that day.

24     Q.  There's an actual police station at

1    O'Hare, correct?

2        A.    Correct.

3        Q.    And that's what you're based out of when

4    you work at O'Hare?

5        A.    Yes.

6        Q.    Where is the station located in relation

7    to the different terminals?

8        A.    It's 519 West O'Hare Street.  It's between

9    Mannheim Road and Bessie Coleman Drive near the

10   terminal five -- the international terminal.

11       Q.    And you mentioned sometimes you would get

12   alerts about baggage being stolen; is that correct?

13       A.    Well, if case reports are made as to

14   stolen luggage, airlines notify the department

15   somehow that baggage, bags are being missing, it's

16   just like anywhere else in the City, if there's high

17   incidents of crime, it gets reported, and then it's

18   like a red flag.

19       Q.    You're not sure if there was a report

20   prior to January 3, 2012 when you came in?

21       A.    At this time I don't recall.

22       Q.    Do you recall what time you first

23   encountered Mr. Idris?

24       A.    It was approximately 3:40, 3:45.

1     Q.   P.m.?

2     A.   Yes.

3     Q.   Immediately prior to when you encountered

4 Mr. Idris, do you recall what you were doing?

5     A.   Yes.

6     Q.   What were you doing?

7     A.   I was walking the lower pedway near the

8 CTA toward terminal three.

9     Q.   Now when you refer to the lower pedway

10 near the CTA, the CTA you're referring to is the

11 blue line stop at O'Hare?

12     A.   Correct.

13     Q.   And the lower pedway is that like a

14 walkway area that leads to the blue line stop?

15     A.   Yeah, it's at the blue line stop and going

16 to terminal 1, 2, 3.

17     Q.   How far were you -- and this is

18 immediately prior to your encounter with Mr. Idris,

19 how far were you from the actual CTA stop?

20     A.   At which point?

21     Q.   Immediately prior to when you encountered

22 Mr. Idris?

23     A.   When you say I encountered, I saw him and

24 spoke to him?

1          A.    OEMC handles the City.  OCC handles

2     strictly the airport.

3          Q.    Okay.  Is there a dispatcher through OCC?

4          A.    Yes.

5          Q.    Is it typical for you to communicate over

6     OCC with other officers?

7          A.    Yes.

8          Q.    But you said it's also common to use the

9     cell phone?

10         A.    Correct.

11         Q.    What would be the difference between when

12    you use a cell phone and when you use OCC?

13         A.    Well, if you're working in a covert manner

14    and you pull out a cell phone, you're less likely

15    for someone to make us out as a policeman as if we

16    pull out a big radio and call for somebody.  The

17    person next to you is like who the heck is this guy.

18         Q.    So the call you received from Officer

19    Moriarty, what did he say exactly?

20         A.    I can't recall verbatim, but he alerted me

21    that there's a person that may have taken a bag from

22    the baggage claim area in terminal three, and he was

23    heading towards the CTA.

24         Q.    Did he say how he knew that?

1    description.  I recall from the arrest, what he had

2    on him when we stopped him.

3        Q.   But you can't recall what was said over

4    the phone with regards to the bag?

5        A.   It was a small, dirty looking shoulder

6    bag.  I don't recall the exact description of an

7    airport bag.  I may have said like an old Pan Am

8    bag.

9        Q.   Was there anything else about this

10   conversation that you can recall as you sit here

11   today?

12       A.   It was very brief.  I was on the phone

13   with -- no, that's about it.

14       Q.   And how long was the phone call?

15       A.   I would say it was less than a minute.

16   Probably, 30 seconds.  I don't recall exactly.

17       Q.   Is that your personal cell phone or a work

18   cell phone you have?

19       A.   It's a personal cell phone.

20       Q.   I'm not going to ask for your phone number

21   but I may request the records at some point in time.

22   Okay.  So after you received this call from Officer

23   Moriarty, what did you do?

24       A.   I started walking in the direction of

1     the area -- that space next to the walkway?

2         A.   Correct.

3         Q.   Were there other civilians walking in that

4     space next to the walkway from what you observed?

5         A.   I don't recall.  I was watching Officer

6     Moriarty and Mr. Idris.

7         Q.   So after Mr. Idris got on the walkway and

8     this is after Officer Moriarty has announced his

9     presence the second time, what's the next thing you

10    saw?

11        A.   I approached and became closer to

12    Mr. Idris who was still looking back at Officer

13    Moriarty.  That's when I announced my office, told

14    him Chicago Police.  I explained to him that I'd

15    like to see his identification to make sure that his

16    bag is his own.

17        Q.   Is this when Mr. Idris is still on the

18    walkway?

19        A.   Correct.

20        Q.   How far down the walkway did this occur?

21        A.   Maybe 20, 25 feet.

22        Q.   Would it be fair to say about a quarter of

23    the way down?

24        A.   Yes.

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 16 of 95 PageID #:213

1       Q.   Did you come in contact with Mr. Idris as

2   you announced your office and explained?

3       A.   What do you mean contact?

4       Q.   Did you grab his shoulder or any part of

5   his body?

6       A.   No.

7       Q.   Did you see Officer Moriarty come in

8   contact with him when you're announcing your

9   presence?

10      A.   No.

11      Q.   What did Mr. Idris say, if anything, to

12  you after you announced your office and explained

13  that you wanted to see his ID?

14      A.   He said you know, fuck you.  Show me your

15  ID.

16      Q.   Did you have your ID on you at that time?

17      A.   Yes.  At that time I approached Mr. Idris

18  I had a lanyard with my Chicago Police

19  identification and my O'Hare Airport Police

20  identification holding both in my hands.  My star

21  was either affixed to that lanyard or I reached over

22  my sweater or jacket exposing my star right next to

23  my gun and handcuffs and radio.

24      Q.   So your ID was plainly visible in the

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 17 of 95 PageID #:214

1    front of your body; is that fair to say?

2        A.    As I approached Mr. Idris I had it out in

3    front of my chest, and actually had it in my hand

4    when I showed Mr. Idris my identification.

5        Q.    Is that prior to when he said, f*** you,

6    show me your ID?

7        A.    It was -- I'd say right at the same time.

8    And I again said, Chicago Police and identified

9    myself.

10       Q.    What did he say after that?

11       A.    He said, fuck you, I ain't showing you any

12   ID -- or I don't have to show you any ID.

13       Q.    This all took place while he was still on

14   the walkway?

15       A.    Correct.

16       Q.    What's the next thing that happened after

17   he told you that he didn't have to show you ID?

18       A.    At this point I walked in the same

19   direction as the moving walkway a few feet.  I

20   straddled the hand hold of the walkway and stood in

21   front of Mr. Idris on the moving walkway.

22       Q.    Is that at the lip of the moving walkway

23   where it ends?

24       A.    This is approximately the middle of the

1    information about stolen luggage at that time?

2                MS. ACUFF:  Objection.  Vague and

3    confusing as to scope, timing.

4                THE WITNESS:  As I said previous, I don't

5    recall if there were any alerts or patterns of theft

6    occurring from terminal three at that time.

7    BY MR. KSIAZEK:

8        Q.    Let me ask it this way.  Other than

9    Officer Moriarty's report, did you have any other

10   reason to believe Mr. Idris had stolen one of his

11   bags?

12       A.    Prior to my engaging him in conversation,

13   it was based on Officer Moriarty's observations and

14   then trying to talk to Mr. Idris, I believe that

15   possibly had a baggage theft.

16       Q.    But other than Officer Moriarty's

17   communications to you, there were no other reasons

18   prior to engaging with Mr. Idris; is that fair to

19   say?

20               MS. ACUFF:  Objection.  Asked and

21   answered.

22               THE WITNESS:  Yes.

23   BY MR. KSIAZEK:

24       Q.    What happened after you jumped over the

1    railing and were standing essentially face-to-face

2    with Mr. Idris?

3         A.    I continued to announce my office.  There

4    were several people trying to get past Mr. Idris.

5    At this point the walkway was full.  I wanted

6    everybody and Mr. Idris in the surrounding area to

7    know that we were the Chicago Police.  I continued

8    to explain to Mr. Idris that we were on the baggage

9    theft mission due to baggage theft at the airport,

10   we needed to check his identification to show that

11   it was his bag.

12        Q.    When you say baggage theft mission, other

13   than Officer Moriarty's phone call to you, was there

14   any other knowledge that placed you on a specific

15   mission?

16             MS. ACUFF:  Objection.  Asked and

17   answered.  Confusing.

18             THE WITNESS:  I don't recall if at roll

19   call we were sent out specifically for a mission or

20   Officer Moriarty -- if we had spoken before that,

21   I'm going to be in terminal three.  I don't recall

22   what was said earlier that day.

23   BY MR. KSIAZEK:

24        Q.    When you say the walkway was full at that

1    time after you jumped over the railing, what do you

2    mean by that?

3         A.   The moving walkway that I was on in front

4    of Mr. Idris, currently there was I'd say

5    approximately 10 to 15 people, maybe more that had

6    been stopped behind Mr. Idris.  Usually, you stand

7    to one side of the walkway and other people pass by

8    on the other.  And Mr. Idris had blocked this and

9    people were acting up and attempting to get around

10   him and the people behind Mr. Idris were attempting

11   to get around them and it was starting to back jam.

12        Q.   So the walkway is still moving?

13        A.   The walkway was still moving.  We were

14   standing on the moving walkway.

15        Q.   You were standing how far away from

16   Mr. Idris at that time?

17        A.   I'd say within a foot to two feet.

18        Q.   Was Mr. Idris standing in the middle of

19   the walkway so to speak or to one of the sides?

20        A.   I'd say he was probably closer to his

21   right side, but the way he was standing with the bag

22   behind him people were not able to get past him.

23        Q.   How wide is that walkway to your

24   knowledge?

1    Q.    Other than standing there did he ever make

2  any motions with his arms to prevent people from

3  waking?

4    A.    Mr. Idris was upset, he was swearing, he

5  was moving his arms around, turning his body, yes.

6    Q.    This is while he was on the walkway?

7    A.    Yes.

8    Q.    He was upset and swearing?

9    A.    Yes.

10    Q.    And moving his arms around?

11    A.    Yes.

12    Q.    When did he start doing that, moving his

13  arms around?

14    A.    I'd say he was from the moment I started

15  to talk to him.  His torso was turning.  His arms

16  were moving.

17    Q.    So that would have been about a quarter of

18  the way down the walkway; is that fair to say?

19    A.    Yeah, quarter way and then halfway when I

20  jumped over.  Somewhere around there.

21    Q.    You said he was moving his torso around;

22  is that right?

23    A.    Yes.

24    Q.    Can you describe how he was doing that?

1      Q.   Who was he talking to when he was turning

2   his body?

3           MS. ACUFF:  Objection.  Assumes facts not

4   in evidence.

5           THE WITNESS:  I was standing there engaged

6   in trying to explain to him the reason for checking

7   his identification and also identifying myself.  So

8   he was shouting at me, and I'm assuming anybody that

9   was in the close proximity.

10  BY MR. KSIAZEK:

11     Q.   So you were standing face-to-face with him

12  but he would turn his body when he was speaking with

13  you?

14     A.   Somewhat, yes.

15     Q.   And as you described he tried to talk with

16  people around him?

17     A.   I wouldn't say he was trying to talk to

18  other people but he was speaking loudly and just

19  kept shouting and swearing and, you know, he didn't

20  have to show us any fucking ID and other things like

21  that.

22     Q.   Other than saying he didn't have to show

23  you a F***ing ID, what other swears did he say?

24     A.   I don't recall everything he said

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 23 of 95 PageID #:220

1      Q.   Did you ever come in contact with

2   Mr. Idris while you were on the moving walkway?

3           MS. ACUFF:  Objection.  Asked and

4   answered.

5   BY MR. KSIAZEK:

6      Q.   At any point in time is what I'm asking.

7      A.   On the moving walkway, no.

8      Q.   Did you see Officer Moriarty come in

9   contact with Mr. Idris at any point in time while he

10  was on the walkway?

11     A.   No.

12     Q.   Have we talked about all the conversations

13  that took place on the moving walkway itself that

14  you can recall?

15     A.   Yes.

16     Q.   Have we talked about all the actions that

17  you observed occur on the moving walkway?

18     A.   Yes, to the best of my recollection.

19     Q.   So once you got off the moving walkway,

20  what's the next thing that happened?

21     A.   We stepped close to the elevator center

22  floor so that the crowd of people that had been

23  behind us could exit, and we'd be out of the way and

24  get out of the way of the area that filled up with

1   to you?

2       A.   I didn't speak with anybody else.  I had

3   my focus on Mr. Idris.

4       Q.   How far away did you walk when you walked

5   towards the elevators from where the end of the

6   walkway is?

7       A.   Approximately, five feet.

8       Q.   Was that out of the flow of traffic?

9       A.   Yes.  Because the elevator center four is

10  right there.  So we had that to our one side and

11  people were flowing each direction around it.  So

12  they weren't walking into us they were walking

13  around us.

14      Q.   Was that off in a corner or was it more

15  still in an open area?

16      A.   I was a little bit off of the center of

17  the walkway.  The walkway continued straight and

18  then around us to the elevator bank.

19      Q.   Did you walk towards a wall?

20      A.   It was the backside wall of the elevator

21  center four in that area.

22      Q.   Did you observe anything occurring when

23  Mr. Idris walked over to that area with you?

24           MS. ACUFF:  Objection.  Vague and

Page 57

1    Q.   Was he swearing?

2    A.   I believe he was continually swearing,

3    yes.

4    Q.   When you say you believe is that something

5    you recall?

6    A.   I don't recall verbatim what he was

7    saying.  He had sworn most of the time there.  I

8    couldn't tell you for certain if once we got to that

9    point if he continued then.  I know he did later on

10   but at that point I don't recall if he said any.

11   Q.   Do you recall any other swear words other

12   than the F word that he used?

13   A.   I wasn't focused on that at that time --

14   what he was saying.  I was asking for identification

15   so we could let him on his way or charge him with

16   theft of a bag if that was the case.

17   Q.   What happened when the three of you were

18   over by the elevators?

19   A.   At that point there were a large number of

20   people who were going back and forth.  They were

21   watching us.

22   Q.   When you say a large number, how many?

23   A.   100, possibly 200.

24   Q.   100 to 200 people?

JENSEN REPORTING (312) 236-6936

1    A.   Yes.

2    Q.   Do you know who any of those people were?

3    A.   No.

4    Q.   Can you describe any of those people?

5    A.   I could give you a vague description of

6  just a cross section.  I couldn't give you an exact

7  description of anybody at that point.  My

8  concentration I was still on Mr. Idris.

9    Q.   Where were these people located?

10   A.   To our right by the elevator banks.  To

11 our left by the CTA pay stations.  The doors to

12 terminal two and the doors behind us by the moving

13 walkway.

14   Q.   And all these people stopped to watch what

15 was going on between the two of you and Mr. Idris?

16   A.   People slowed down.  It became crowded.

17 Some continued moving.  Some had stopped.

18   Q.   Was there like a wall of people?

19   A.   There was a large number of people.

20 People were continuing to walk around the crowd,

21 other people had stopped.  I couldn't tell you

22 exactly where everybody was set up but in our

23 general area this corridor had filled up with people

24 that normally were moving back and forth had

1    stopped.

2         Q.   How far away is this from the L entrance?

3         A.   Probably, 20 to 40 feet from the actual

4    turnstiles, maybe a little more.

5         Q.   How long did these people stop for?

6         A.   It could have been, you know, two to three

7    minutes.  I don't recall an exact time.

8         Q.   When you say the corridor filled up, was

9    it difficult to walk through the people from what

10   you observed?

11        A.   I wasn't walking but it had filled up and

12   became another concern of mine that we were being

13   surrounded by people while we're trying to deal with

14   an issue.

15        Q.   How close was the closest person to you

16   that stopped to observe the scene?

17        A.   I'd say there were people within five to

18   ten feet of us.  If not -- there were also people

19   that were passing by that were probably within two

20   to three feet of me.

21        Q.   Did it become impossible to pass by that

22   area in the hallway?

23        A.   I wasn't trying to walk by.  I don't think

24   so.  I still think people -- it's a pretty big

1    hallway.  It was definitely stopping the normal flow

2    of foot traffic.

3         Q.   And the flow of traffic was slow or

4    stopped for a couple minutes?

5         A.   To the best of my recollection, yes.

6         Q.   So you went by the elevators with Officer

7    Moriarty and Mr. Idris, he keeps telling you words

8    to the effect, you don't have a right to stop him.

9    What's the next thing that happens after this

10   conversation?

11        A.   Due to the fact that we're not getting any

12   headway with Mr. Idris and the crowd in this

13   hallway, I stepped back from Mr. Idris and called

14   for additional officers to respond to the scene and

15   I asked for uniformed officers.  My concern was that

16   people wouldn't -- the additional people that were

17   there wouldn't have known that we were police and

18   would have tried to intervene in some way.

19        Q.   But you had your badge on you?

20        A.   I had my star and my identification but I

21   wasn't broadcasting to the crowd that I was the

22   police.  I was still concerned with Mr. Idris.

23        Q.   Now when you were over by the elevators,

24   did you say you were still announcing your office at

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 29 of 95 PageID #:226

1    anywhere?

2        A.    Besides the initial two times?

3        Q.    Right.

4        A.    He would interject as I was speaking to

5    him, also.  We were telling Mr. Idris that we were

6    the police and to show us his identification so he

7    could go on his way.

8        Q.    Did Mr. Idris ever show you his ID?

9        A.    Did he produce it, no.

10        Q.    How long after you went over towards the

11    elevator banks did you call for backup?

12        A.    Approximately it could have been 20

13    seconds to a minute after Mr. Idris, you know, if we

14    weren't getting any headway with him.  He threw his

15    bag down to the ground and when he didn't produce an

16    ID at that time I called for an assist.

17        Q.    All right.  So within 20 seconds to a

18    minute there had been a significant crowd of over

19    100 people in that area where you were by the

20    elevator banks?

21        A.    Yes.

22        Q.    And when did Mr. Idris throw his bag to

23    the ground?

24        A.    Shortly after we had stopped by elevator

1      Q.   Did you use your cell phone to call for

2  backup?

3      A.   No, I used our police radio.

4      Q.   Why did you use the police radio?

5      A.   So I could get immediate attention from

6  the dispatcher, and the dispatcher would be able to

7  call the job out, and anyone listening to the radio

8  would hear that we called for a disturbance and we

9  could get the most officers to our location as quick

10  as possible.

11      Q.   What did you say over dispatch?

12      A.   I believe I said that we had a disturbance

13  in the lower pedway by elevator center four.  If we

14  could get a couple extra officers down here,

15  preferably uniformed officers.

16      Q.   What did you see Officer Moriarty doing at

17  that time when you called for backup?

18      A.   Officer Moriarty was still standing next

19  to Mr. Idris.

20      Q.   Did Mr. Idris ever make any motions

21  towards either of you?

22      A.   As in trying to strike us?

23      Q.   Right.  Did he ever try and strike you or

24  put the fist towards you or anything like that?

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 31 of 95 PageID #:228

1         A.    As far as swinging to strike us, no.

2         Q.    When he had the fists as you described,

3    how long did he have his hands in fists?

4         A.    I don't recall exactly.  It could have

5    been, you know, three -- two to three or five

6    seconds, maybe a little more.  I don't recall.

7         Q.    Did he make like a punching motion?

8         A.    Not in our direction.  He had his hands up

9    with his fists.  He may have pushed his hands

10   forward but I didn't perceive it as a full extension

11   of a swing.

12        Q.    How long did it take for backup to arrive?

13        A.    I would guess within 30 seconds maybe when

14   I saw first a uniformed officer arrive.

15        Q.    Did they have trouble coming through the

16   crowd?

17        A.    I never asked.  I still had my attention

18   on Mr. Idris.  I was able to see uniformed officers

19   in my peripheral so I knew we had an assist.  And I

20   believe Sergeant Conroy came from the elevator

21   center above us.  I don't know if he took the stairs

22   or the elevator.

23        Q.    When backup officers came, were there

24   still 100 to 200 people still watching the scene?

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 32 of 95 PageID #:229

1              MR. KSIAZEK:  If you want to take a break

2     that's fine.

3                      (Break taken.)

4     BY MR. KSIAZEK:

5         Q.   Which officers arrived first as backup, if

6     you remember?

7              MS. ACUFF:  Objection.  Asked and

8     answered.

9              THE WITNESS:  I don't recall which

10    officers.  They were uniformed officers that's were

11    working the terminal.  I remember seeing the blue

12    shirts and Sergeant Conroy arrived.

13    BY MR. KSIAZEK:

14        Q.   Did they all arrive around the same time?

15        A.   The uniformed officers were there shortly

16    there before the Sergeant.

17        Q.   How many uniform officers came?

18        A.    I don't recall.  I saw two or three or

19    possibly more.

20        Q.   All the uniformed officers and Sergeant

21    Conroy were they present when you placed Mr. Idris

22    in handcuffs?

23        A.    I waited until I had backup before I

24    placed Mr. Idris in handcuffs.  Sergeant Conroy was

1    there around that time.  I don't recall at which

2    time he stepped up.  If he was there during or

3    after.

4        Q.   But at least the uniform officers were

5    there, is that what you said?

6        A.   Yeah, I didn't feel comfortable trying to

7    place Mr. Idris in custody without additional

8    officers there to assist us if we needed assistance.

9        Q.   Did Mr. Idris resist you in any way when

10   you put the handcuffs on him?

11       A.   He did not pull away, but he remained

12   stiff and would not easily let his arms behind him.

13   He was ridged I would say.

14       Q.   But he didn't struggle against you when

15   you put his arm behind his back?

16       A.   He didn't allow us easy access but he

17   didn't pull away.  He remained ridged so that we

18   actually had to move his arm.

19       Q.   You were the officer that put the handcuff

20   on Mr. Idris's right wrist; is that right?

21       A.   That's correct.

22       Q.   And you pulled his right arm behind his

23   back to do that?

24       A.   I placed it on him when his hand was in

1    front of him.  And then I brought his arm to his

2    side and then the rear to attach his left wrist to

3    the handcuff.

4         Q.   Were you the one that attached the left

5    hand to the right hand?

6         A.   Yes.

7         Q.   Did he ever complain about the handcuffs

8    being too tight when you put them on?

9         A.   No.

10        Q.   At any time when the handcuffs were on

11   Mr. Idris, did you ever hear him complain that the

12   handcuffs were too tight?

13        A.   No.

14        Q.   What happened after you placed handcuffs

15   on Mr. Idris?

16        A.   Sergeant Conroy had called for the wagon

17   so we could transport Mr. Idris back to our station.

18   There was not one available.  He advised us to just

19   go up to the bus shuttle center to get out of the

20   crowd.  The crowd was too large.  We'll have a car

21   meet us at the bus shuttle above us.  So we took the

22   elevator up one floor and transported Mr. Idris to

23   our station.

24        Q.   How big was the crowd at that time?

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 35 of 95 PageID #:232

1      A.   I believe at that time we were walking

2  Mr. Idris to the elevator, there was still a large

3  crowd but the flow had started moving again.

4      Q.   Would you say the crowd was about the same

5  as it was when you had called for backup?

6      A.   I'd say there was the same amount of

7  people but instead of standing, people were starting

8  to move and there were still a few people standing

9  around but most of the crowd -- it was like the

10  crowd had just dispersed.  They were starting to

11  move.

12      Q.   Did Mr. Idris say anything when you placed

13  him in handcuffs?

14      A.   I don't recall.

15      Q.   So you said you went to the bus station;

16  is that right?

17      A.   Bus shuttle center is located directly

18  above where we were.  So we were at the elevator

19  center four.  We took the elevator up one level,

20  exited, and walked through the bus shuttle center

21  driveway where a vehicle was waiting for us.

22      Q.   That was a police vehicle was waiting?

23      A.   Yes.

24      Q.   Did Mr. Idris say anything to you when you

1    walked him to the shuttle center?

2         A.   Not that I recall.

3         Q.   Do you know who was in the vehicle at the

4    shuttle center?

5         A.   I don't recall exactly.  I believe I got

6    in the back seat with Mr. Idris for the ride to the

7    station.

8         Q.   Did Officer Moriarty also get in the

9    vehicle?

10        A.   No.

11        Q.   Do you know the officer that was driving

12   the vehicle?

13        A.   I believe it was Officer Orlando Haljing.

14        Q.   Did you see what Officer Moriarty did at

15   that time?

16        A.   I did not see.  I believe he was returning

17   back to the terminal to get his vehicle but I don't

18   know for sure.

19        Q.   How long of a drive is it from the shuttle

20   center to the police station at O'Hare?

21        A.   Say two to three to five minutes.

22        Q.   Did you take Mr. Idris's luggage with him?

23        A.   Yes.

24        Q.   So that went in the car with you?

1    A.   I don't know if it came in the car that I

2    was in, but the luggage was brought back to our

3    station where it was inventoried.

4    Q.   And do you recall any conversation that

5    took place on the car ride over to the police

6    station?

7    A.   No, I don't recall.

8    Q.   What happened once you arrived at the

9    police station?

10    A.   Mr. Idris was placed in our holding cell.

11    The handcuffs were taken off.  Conducted a custodial

12    search and asked pertinent questions regarding the

13    arrest report.  I continued trying to explain to

14    Mr. Idris as to what happened.  Why we stopped him

15    and why we placed him in custody.  And he didn't

16    have much of a reaction.  He didn't want to hear

17    anymore or engage me in conversation so I just

18    started the process of the arrest.  After that he

19    was handcuffed one wrist to our bench and that was

20    about it.

21    Q.   Did you handcuff him to the bench?

22    A.   Yes.

23    Q.   And this was after you took off the

24    handcuffs that you placed on him in the terminal?

1    and from the CTA.  I can't think of the rest of the

2    charge off the top of my head, but his actions were

3    disruptive and disorderly.  Disrupting passengers

4    from the regular flow of exiting the airport and the

5    train.

6         Q.   Other that what you've described, do you

7    recall any other conversation that took place at the

8    police station between yourself and Mr. Idris?

9         A.   No, I don't recall.

10        Q.   How long were you at the station with

11   Mr. Idris?

12        A.   I'd say, approximately, two hours.

13        Q.   Did you prepare paperwork at the station?

14        A.   Yes.

15        Q.   What paperwork did you prepare?

16        A.   A complaint.

17        Q.   Criminal complaint?

18        A.   Yes.

19        Q.   Why did you prepare a criminal complaint?

20        A.   It's part of the arresting procedure.

21        Q.   Did you sign the complaint?

22        A.   No.

23        Q.   Why not?

24        A.   Because I wasn't the complainant.

1    Q.   Who was the complainant?

2    A.   It was an agent of the CTA.

3    Q.   What was his name?

4    A.   I don't recall off the top of my head.

5    Q.   Why was the CTA agent the complainant?

6    A.   Because Mr. Idris's actions disrupted the

7    flow of passenger traffic on and off the CTA.

8    Q.   This was 20 to 40 feet away from the CTA;

9    is that right?

10   A.   Where we had stopped him?

11   Q.   Yes.

12   A.   Approximately, yeah.

13   Q.   Did you speak with Victor Aponte before

14   you took Mr. Idris to the station?

15        MS. ACUFF:  Objection.  Lack of

16   foundation.

17        THE WITNESS:  I never spoke with the CTA

18   agent.  I was engaged with Mr. Idris, placing him in

19   custody, and I maintained a control of Mr. Idris

20   until we got to the station.

21   BY MR. KSIAZEK:

22   Q.   Do you know if any officer spoke to Mr.

23   Aponte before you took Mr. Idris to the station?

24        MS. ACUFF:  Objection.  Lack of

1    foundation.

2    BY MR. KSIAZEK:

3         Q.   If you know.

4         A.   I don't recall who spoke -- with anybody

5    from the CTA.

6         Q.   How did you get Mr. Aponte's information?

7         A.   I don't recall how we got his information.

8    I believe after I finished the complaint, another

9    officer had it signed.

10        Q.   Do you know who that officer is?

11        A.   No, I don't recall.

12        Q.   Is there a reason why you didn't file the

13   complaint -- prepare it for yourself, is what I

14   mean?

15        A.   Because we had an agent for the CTA to

16   sign a complaint so it would have been redundant for

17   me to sign something else.

18        Q.   It's possible that you could have signed a

19   complaint against him, right?

20             MS. ACUFF:  Objection.  Calls for

21   speculation or hypothetical.

22             THE WITNESS:  Had there been another

23   charge, I could have signed a complaint I believe.

24

1    section of the arrest report?

2        A.    We discussed the incident, correct.

3        Q.    Did you see the police report after

4    Officer Moriarty completed it?

5        A.    Yes.

6        Q.    And what's the next thing you did after

7    preparing your reports?

8        A.    Mr. Idris was transported to the 16th

9    District where he was fingerprinted and

10   photographed.

11       Q.    Do you know who transported him to the

12   16th District?

13       A.    I don't recall.

14       Q.    You remained at O'Hare; is that right?

15       A.    I don't recall if I remained or if I

16   assisted in the transport.

17       Q.    And I believe you stated this earlier but

18   I'll ask it, while he was in the station, did you

19   ever hear Mr. Idris complain about handcuffs?

20       A.    No.

21       Q.    Was that the last time you saw Mr. Idris

22   after he was transported to the 16th District?

23       A.    Yes.

24       Q.    Did you ever go to court for Mr. Idris's

1    case?

2         A.    No.

3         Q.    Why not?

4         A.    I was never notified of a court date.

5         Q.    How do you usually get notified of court

6    dates?

7         A.    We get notified at work.

8         Q.    Is that through the CLEAR system?

9         A.    There's a court notification board where

10   the sergeant reads off our notification and then

11   signs them.

12        Q.    So you're saying --

13        A.    You can also look it up in the court file,

14   but I was never notified to be in court.

15        Q.    So you're saying you never got

16   notification on the court notification board?

17        A.    I never got any notification that I was

18   requested at any court for Mr. Idris.

19        Q.    In whichever manner you can get

20   notifications either through the computer or the

21   board?

22        A.    We get official notifications and I double

23   check that so I don't miss court.

24        Q.    If you had gotten a notification would you

1    have gone?

2         A.    Absolutely.

3              MR. KSIAZEK:   All right.   Let's take a

4    quick break and then get to the documents.

5                   (Break taken.)

6    BY MR. KSIAZEK:

7         Q.    Before I go to some of the documents, did

8    you ever get reprimanded for never going to court in

9    this case?

10        A.    No, I was never notified so I was never

11   reprimanded.

12        Q.    Let me give you what has been marked as

13   Plaintiff's Exhibit 1 and these are two criminal

14   complaint forms that were produced as FCRL 7 & 8.

15   Have you seen these documents before?

16        A.    Yes.

17        Q.    And you said you were the one who prepared

18   the criminal complaint form?

19        A.    Correct.

20        Q.    So did you write in the typed words in

21   this document, the ones that aren't handwritten?

22        A.    Correct.

23        Q.    Did you handwrite any information on this

24   document?

1        A.    No.

2        Q.    So where it has Victor Aponte as a

3    signature, that wasn't there when you prepared this

4    document; is that right?

5        A.    That's correct.

6        Q.    And you didn't write into CTA platform?

7        A.    No, I did not.

8        Q.    Did you clerk this document?

9        A.    No.

10       Q.    Is there a reason why you didn't clerk the

11   document?

12       A.    Either I assumed that the officer that had

13   it signed would clerk it or I didn't observe that it

14   wasn't clerked.

15       Q.    As you said you don't -- which officer had

16   it signed?

17       A.    No.  I didn't clerk it because it wasn't

18   signed at the time I prepared it.

19       Q.    And you didn't have Mr. Aponte sign it?

20       A.    I did not.

21       Q.    Do you see the court date at the top of

22   the page where it has court branch 23-2 and February

23   29, 2012, 9:00 a.m.?

24       A.    Yes.

```
 1    STATE OF INDIANA     )
                           )  SS
 2    COUNTY OF LAKE       )

 3

 4              I, Trixie L. Schuzer, Certified Shorthand

 5    Reporter and Notary Public, do hereby certify that

 6    on the 21st day of February, 2013, the deposition of

 7    the witness, JOHN CONWAY, was taken before me,

 8    reported stenographically, and was thereafter

 9    reduced to typewriting under my direction.

10              The said deposition was taken at the

11    offices of Ed Fox & Associates, 300 West Adams

12    Street, Chicago, Illinois; and there were present

13    counsel as previously set forth.

14              The said witness, JOHN CONWAY, was first

15    duly sworn to tell the truth, and was then examined

16    upon oral interrogatories.

17              I further certify that the foregoing is a

18    true, accurate, and complete record of the questions

19    asked of and answers made by the said witness, JOHN

20    CONWAY, at the time and place hereinabove referred

21    to.

22

23

24
```

1          The signature of the witness, JOHN CONWAY,

2     was reserved by agreement of counsel.

3          The undersigned is not interested in the

4     within case, nor of kin or counsel to any of the

5     parties.

6          Witness my official signature and seal as

7     Notary Public in and for Lake County, Indiana, on

8     this 16th day of May, 2013.

9

10

11
                        _____
                        TRIXIE L. SCHUZER, CSR
12                      180 North LaSalle Street
                        Suite 2800
13                      Chicago, Illinois 60601
                        Phone: (312) 236-6936
14

15    CSR No. 084.004763

16

17

18

19

20

21

22

23

24

# **Exhibit F**

Idris vs. City of Chicago

12 CV 6271

Deposition of:  Officer Michael Crooker

Taken on:  May 22, 2013

JENSEN LITIGATION SOLUTIONS

www.jensenlitigation.com



Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 49 of 95 PageID #:246

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013                                    Page 1

1                      IN THE UNITED STATES DISTRICT COURT
                           NORTHERN DISTRICT OF ILLINOIS
2                               EASTERN DIVISION

3
     ELIJAH IDRIS,                          )
4                                           )
                            Plaintiff,      )
5                                           )
                 vs.                        )   No. 12 CV 06271
6                                           )
     OFFICER JOHN CONWAY, STAR              )
7    NO. 9524, OFFICER WILLIAM              )
     MORIARTY, STAR NO. 6313, and          )
8    the CITY OF CHICAGO,                   )
                                            )
9                           Defendants.     )

10

11             The deposition of OFFICER MICHAEL CROOKER,

12    called by the Plaintiff for examination, taken pursuant

13    to notice and pursuant to the Federal Rules of Civil

14    Procedure for the United States District Courts

15    pertaining to the taking of depositions, taken before

16    Kathy J. Szotek, Certified Shorthand Reporter and Notary

17    Public, at 300 West Adams Street, Suite 330, Chicago,

18    Illinois, commencing at 1:35 p.m. on May 22, 2013.

19

20

21

22

23

24

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

```
 1   APPEARANCES:

 2       ED FOX & ASSOCIATES
         MR. JONATHAN R. KSIAZEK
 3       300 West Adams Street
         Suite 330
 4       Chicago, Illinois 60606
         Phone:  (312) 345-8877
 5       E-mail:  jksiazek@efox-law.com

 6            On behalf of the Plaintiff;

 7       CITY OF CHICAGO - DEPARTMENT OF LAW
         MS. KRISTIN ACUFF
 8       30 North LaSalle Street
         Suite 900
 9       Chicago, Illinois 60602
         Phone:  (312) 742-7035
10       E-mail:  kristin.acuff@cityofchicago.org

11            On behalf of the Defendants.

12

13                  *    *    *    *    *    *

14

15

16

17

18

19

20

21

22

23

24
```


JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013                                     Page 3

```
1                        I N D E X

2    WITNESS                                    PAGE

3    OFFICER MICHAEL CROOKER

4         Direct Examination by Mr. Ksiazek .....    4

5

6

7                      E X H I B I T S

8    CROOKER DEPOSITION EXHIBIT                  PAGE

9         No. 1 ...............................   65

10

11   Exhibit retained by Counsel.

12

13

14

15

16

17

18

19

20

21

22

23

24
```



Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 4

```
 1                        (Witness sworn.)

 2    WHEREUPON:

 3                    OFFICER MICHAEL CROOKER,

 4    called as a witness herein, having been first duly

 5    sworn, was examined and testified as follows:

 6                    DIRECT EXAMINATION

 7    BY MR. KSIAZEK:

 8         Q.   Good afternoon.   Can you please state and

 9    spell your name.

10         A.   Last name is Crooker, C R O O K E R, Michael.

11         Q.   Michael?

12         A.   Yes.

13         Q.   Spelled the normal way?

14         A.   Spelling?

15         Q.   Yeah.

16         A.   Yeah, common spelling.

17         Q.   Common spelling.   Okay.

18         MR. KSIAZEK:   All right.   For the record this is

19    the deposition of Officer Michael Crooker taken in the

20    case of Idris versus Conway, et al., Case

21    No. 12 CV 6271.   The deposition is being taken pursuant

22    to all applicable Federal and local rules and by

23    agreement of the parties.

24    BY MR. KSIAZEK:
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 19

1    that?

2        Q.    Sure.   On January 3rd, 2012, was that a day

3    when you were on normal patrol or did you have some type

4    of targeted activity that you were supposed to be doing

5    that day?

6        A.    Well, we're always -- you're always on patrol.

7    However, there are -- when incidents come up, we were

8    informed in some roll calls that there were some baggage

9    thefts going on and to give special attention to the

10   baggage area when we're by the terminals.

11       Q.    Who typically runs the roll call?

12       A.    The sergeant.

13       Q.    Do you know who the sergeant on duty on

14   January 3rd, 2012 was?

15       A.    I would have to see the sheets.

16       Q.    But on January 3rd, 2012, did a sergeant give

17   you specific instruction regarding baggage -- bags being

18   stolen?

19       A.    Well, that was something -- there was times

20   where it's -- that this is an ongoing issue and if it's

21   brought up on one day it doesn't automatically mean the

22   next day that that issue isn't -- you know, isn't to be

23   addressed.   And it's occasionally brought up, but I

24   can't say it was brought up specifically that day; but

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

```
 1   we were aware that there were baggage thefts, you know,

 2   occurring in the airport at the time.

 3        Q.    What kind of information do you recall having

 4   at that time about the baggage thefts that were going

 5   on?

 6        A.    I can't recall anything real specific about

 7   any incident with a bag -- you know, a specific part of

 8   it.

 9        Q.    Do you recall anything about individuals who

10   were being suspected of taking the bags just generally?

11        A.    It basically said keep an eye on the baggage

12   area, we're having baggage thefts.

13        Q.    Was there a specific area that they were

14   looking for baggage thefts, a specific terminal?

15        A.    No, that could occur anywhere.  You know, that

16   could occur anywhere.

17        Q.    So at some point on January 3rd, 2012, did you

18   become aware of an incident between Officer Moriarty and

19   an individual who was named Mr. Idris?

20        A.    Yes.

21        Q.    When did you first learn of that incident?

22        A.    Now, to the best of my recollection now, okay,

23   it was -- I believe I received a call from Officer

24   Moriarty and he said he was -- he was looking at a
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 28

1       A.    No.

2       Q.    What did it appear to you -- Let me rephrase

3    it.

4             What was going on when you first saw those

5    three people?

6       A.    It appeared he was waiting for Mr. Idris to

7    come towards the end of the pedway next to the pedway,

8    and based on what I believed that they were -- that's

9    when they were going to begin a field interview with

10   him.

11      Q.    From your observations did it appear that

12   there was any conversation taking place at that time?

13      A.    Yes.

14      Q.    Between Mr. Idris and the two officers?

15      A.    Right.  I believe I saw Officer Conway

16   address -- come to Mr. Idris first.

17      Q.    That was at the end of the pedway?

18      A.    Yes.

19      Q.    Other than yourself and Officer Conway and

20   Officer Moriarty, did you see any other officers in that

21   area?

22      A.    Not at that time.

23      Q.    So as you continue walking towards where Idris

24   and Conway and Moriarty are, what's the next thing that

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 56 of 95 PageID #:253

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 29

```
 1    you see happen?
 2         A.    I saw Officer Conway identify himself.
 3         Q.    To Mr. Idris?
 4         A.    Yes.
 5         Q.    At that time was Mr. Idris off of the pedway?
 6         A.    He was getting off or about to exit the
 7    pedway.   That's the best I can answer that.
 8         Q.    How did Mr. Idris appear to you; by that I
 9    mean physically, can you give a description?
10         A.    Based on my recollection he was a, you know,
11    stocky guy and -- did you want a physical description of
12    him?
13         Q.    Right.
14         A.    I believe he had a little facial hair and I
15    thought he was a -- you know, he was kind of a big -- he
16    was a semi bigger, stocky individual.
17         Q.    African-American?
18         A.    Yes.
19         Q.    Do you recall what he was wearing that day?
20         A.    No, I don't.
21         Q.    Did he have bags on him at that time?
22         A.    I believe he had his -- yes, he did.
23         Q.    How many bags, if you remember?
24         A.    He had at least one.
```

312.236.6936
877 653.6736
Fax 312 236 6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

1    A.    Well, not too long after he slammed the bag.

2  So I don't know exactly when he called it in, but he

3  definitely called in for assistance.

4    Q.    So other officers arrived on the scene after

5  Idris slammed his bag?

6    A.    Yes.

7    Q.    So we talked about Mr. Idris essentially

8  saying, "Get the F away.  I'm not going to show you

9  anything" on at least two occasions; is that right?

10   A.    At least.

11   Q.    Okay.  Other than the two occasions that you

12 talked about, did he say anything else that you can

13 recall before slamming his bag to the ground?

14   A.    "I'm not showing you fucking shit."

15   Q.    Is there anything else you can recall hearing?

16   A.    His loud tone bantering was the best

17 recollection I have of the whole incident.

18   Q.    Was he making any physical movements before he

19 slammed his bag to the ground?

20   A.    Well, he was getting pumped up and he was --

21 you can see him getting enraged (gesturing).  And

22 this -- I just was figuring with the linchpin -- I just

23 figured that it was just a matter of time before this

24 turned into a physical altercation.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 32

```
 1    can't recall exactly.
 2         Q.   He didn't block passengers from getting off
 3    the pedway at that time, right?
 4         MS. ACUFF:   Objection to the form.
 5    BY MR. KSIAZEK:
 6         Q.   Go ahead.
 7         A.   At that moment it was just at the initial
 8    start.
 9         Q.   But he didn't stop in front of the pedway and
10    not let anyone off; is that right?
11         A.   Not at that point.
12         Q.   Okay.   So then you said once Idris got off the
13    pedway he began becoming uncooperative?
14         A.   Right.
15         Q.   How did he --
16         MS. ACUFF:   Objection -- That's okay.  Go ahead.
17    BY MR. KSIAZEK:
18         Q.   How did he become uncooperative?
19         A.   He said, "Get away from me.  Get the fuck away
20    from me."
21         Q.   He said that to the two officers?
22         A.   Yes.   "I'm not showing you anything.  Get the
23    fuck away from me."
24         Q.   Now, at that time where were you when he said
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 33

1   that?

2      A.   Well, when he said that I stepped back because

3   I felt that if I -- if he had a third officer come in he

4   would just -- it would -- it probably would turn -- it

5   was alarming because I felt that he was -- could become

6   very combative and I said it would be better to stay out

7   of this one right now.

8      Q.   Well, so at some point did you go to the area

9   where Mr. Idris and the two officers were?

10      A.   In the general -- I was in the vicinity of the

11   area, yes.

12      Q.   Right.  So were you standing with Officer

13   Conway and Moriarty after Idris got off the pedway?

14      A.   Not right next to them, no.

15      Q.   How far away were you from the two officers?

16      A.   It varied.  It varied.

17      Q.   Well, initially before he said, "Get the F

18   away from me," where were you?

19      A.   I don't recall.

20      Q.   Were you able to observe what was going on?

21      A.   Sure.

22      Q.   And could you hear what was being said back

23   and forth?

24      A.   Yeah, pretty -- Yes.

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 60 of 95 PageID #:257
Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013                                      Page 35

1        Q.    Did you identify yourself as an officer to

2   Mr. Idris?

3        A.    At one time I tried to show him my badge when

4   he was becoming explosive, trying to get him to

5   cooperate.

6        Q.    Was that after he said, "Get the F away from

7   me"?

8        A.    It was a little bit farther down the line.

9        Q.    Okay.   So Mr. Idris says, "Get the F away from

10  me"; what's the next thing that happens?

11       A.    Again they tried to persuade him, showing

12  again the IDs, explain the reason for the stop, and he

13  says, "Get the fuck away from me.   I ain't showing you

14  shit."

15       Q.    When you heard Mr. Idris says, "I'm not

16  showing you shit," had you heard Officer Moriarty or

17  Conway ask him for anything?

18       A.    They wanted -- Yes, for an ID.

19       Q.    When did you hear them ask him for an ID?

20       A.    When they -- Basically when they first came up

21  to him they asked -- they gave him a reason for the stop

22  and asked him for an ID.

23       Q.    And Mr. Idris didn't showed them an ID at that

24  time?


JENSEN
Litigation Solutions

1   not sure either way.

2        Q.   So you mentioned that a crowd gathered?

3        A.   Yes.

4        Q.   Did the crowd gather before Mr. Idris threw

5   his suitcase to the ground?

6        A.   I don't recall.  I just -- That crowd was

7   gathering, you know, at various points.

8        Q.   When Mr. Idris was getting irate and yelling,

9   were you still by the elevator banks at that time?

10       A.   I was in the vicinity of them.

11       Q.   When you say the crowd gathered, how many

12  people gathered at that scene?

13       A.   I can only estimate.

14       Q.   What's your estimate?

15       A.   Somewhere between 15 and 25 people, maybe up

16  to 30.  I just -- You know, I didn't have a -- wasn't

17  focused on a head count.

18       Q.   When you say that these people gathered, where

19  did they gather?

20       A.   All along the -- From what I saw -- Now, I

21  didn't see how many people were on the other side of the

22  elevator bank, but from where I was at they were

23  gathered from one side of the pedway past it -- past the

24  other side of the pedway and in a line.

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 39

```
1         Q.    So the one side of the pedway being -- do you

2    mean where you get on the pedway to where you get off

3    the pedway or something else?

4         A.    Well, there's two pedways going east and west.

5    So they were lined up -- it was east and west, you know.

6    I mean, they were just lined up in the hallway.

7         Q.    Lined up in the area just at the lip of the

8    pedway, the end of the pedway?

9         A.    Right, all in that area.  And I don't know

10   what was happening beyond the elevator banks or anywhere

11   else, but that's just what I saw.

12        Q.    The people that gathered, did they stop?

13        A.    Yes.

14        Q.    So --

15        A.    There was a few that tried to move out, but

16   most -- many of them stopped.  But again, I wasn't

17   really paying attention to that.  I was just paying

18   attention to the situation -- the totality of the

19   situation.

20        Q.    Was traffic stopped when these people gathered

21   to observe the scene?

22        A.    What do you mean by traffic?

23        Q.    Were other passengers unable to get past that

24   area where this incident was taking place?
```

312.236.6936
877.653.6736
Fax 312 236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 63 of 95 PageID #:260

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 36

1      A.   He never did.

2      Q.   So the second time that Mr. Idris said, "I'm

3   not showing you anything, get the F away from me," what

4   happened after that?

5      A.   They were still trying to use reason and

6   persuasion to get him to cooperate and he refused and he

7   became even more irate to the point where I was alarmed

8   that I felt that it was just a matter of time before he

9   was going to become combative and maybe become an

10  assailant.   And then at that point he was enraged and we

11  had a crowd gathered -- that had been gathering by now,

12  and he took his suitcase and he says -- and he was

13  ranting and raving and yelling and swearing and he

14  slammed it to the ground.   And he was addressing -- And

15  one thing I do remember vividly is him looking at the

16  crowd with his eyes wide open (gesturing).

17     MS. ACUFF:   And for the record, Officer Crooker is

18  opening his eyes wide and holding them open with his

19  hands.

20  BY MR. KSIAZEK:

21     Q.   When you say that Officer Conway and Officer

22  Moriarty were trying to use reason and persuasion to

23  convince Mr. Idris, what were they saying to him?

24     A.   They were just being -- Let's see, let me --

312.236.6936
877.653.6736
Fox 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 42

```
1        MS. ACUFF:  And for the record, Officer Crooker is
2    clenching his fists.
3    BY MR. KSIAZEK:
4        Q.   Right.  Was he clenching his fists?
5        A.   Yes, he was.  Now, I recall that better -- his
6    first reaction was slamming the bags, then he was like
7    this (gesturing) and then that's when he was addressing
8    the crowd too.
9        Q.   So when you say he slammed his bags and then
10   when you say "like this," you have your fists clenched?
11       A.   Right, he was pumped up and he was yelling and
12   screaming and he was looking right at the crowd with his
13   eyes bulging.
14       Q.   All right.  So he clenched his fists before he
15   slammed his bag to the ground?
16       A.   No, after he slammed.
17       Q.   All right.  Did you see him with clenched
18   fists at any point prior to when he slammed his bag to
19   the ground?
20       A.   Well, he was holding his bag, so no.  That's
21   the best of my recollection on that.
22       Q.   So he was holding his bag, he slammed it to
23   the ground when he was holding his bag?
24       A.   Could you repeat that, please.
```



Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 43

1      Q.    Sure.   When you first came to the scene and

2   observed Mr. Idris, was he holding his bag at that time?

3      A.    Yes.

4      Q.    Was he holding his bag the entire time -- Let

5   me rephrase.

6            Was he holding the bag the entire time before

7   he slammed it to the ground?

8      A.    To the best of my recollection he was.

9      Q.    Then after he slammed the bag to the ground,

10  that's when he made clenched fists?

11     A.    Yes.

12     Q.    And that's when he addressed the crowd?

13     A.    Yes.

14     Q.    What did he say to the crowd?

15     A.    He was just ranting, making a -- I can't

16  even -- I don't recall exactly what he was saying, but

17  he was ranting and raving.  And from my point as a

18  reasonable person, he was trying to get my -- you know,

19  he was trying to draw them into the situation.

20     Q.    When you say he was ranting and raving, can

21  you tell me anything he was saying?

22     A.    I can't recall.  He was just screaming and

23  yelling.  It was -- He was breaching the peace.

24     Q.    Why do you say he was breaching the peace?



Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 66 of 95 PageID #:263

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 44

1      A.   He was loud tone, screaming, hollering, people

2  couldn't pass through the area he was standing, people

3  were stopped, you know.

4      Q.   When he was yelling and screaming after

5  throwing his bags to the ground, was he swearing at that

6  time?

7      A.   He was swearing after that time.

8      Q.   Did you hear Officer Moriarty or Officer

9  Conway say anything to him when he was addressing the

10  crowd?

11      A.   No, because he was so loud you couldn't -- he

12  was the only person I heard.  Plus, he was so animated

13  and explosive even myself got caught up with Mr. Idris's

14  behavior.

15      Q.   When you say you got caught up, how did you

16  get caught up?

17      A.   Well, I mean, his behavior was alarming to me

18  because I felt that he was still escalating at that

19  point that he was going to become physical -- it was

20  going to become a physical altercation -- there might be

21  a physical altercation there.

22      Q.   So you said you saw Mr. Idris clench his

23  fists, right?

24      A.   Uh-huh.



Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 67 of 95 PageID #:264

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 49

```
 1    I don't know.
 2        Q.    What took place in between the one to
 3    two minutes?
 4        A.    I don't recall exactly, but it was more or
 5    less just trying to contain the situation from
 6    becoming -- becoming -- escalating any farther.
 7        Q.    What did you see Mr. Idris do during that time
 8    frame?
 9        A.    His behavior was pretty much the same as
10    far -- you know, he was yelling and screaming.  That's
11    the most vivid thing that I remember of the incident is
12    he was explosive basically during the entire time.  I
13    can't tell you specifically minute by minute blow, but
14    that was the one thing that stood out in my mind this
15    whole incident.
16        Q.    You mentioned earlier that you saw Mr. Idris's
17    eyes, right?
18        A.    Yes.
19        Q.    And his eyes were really big?
20        A.    Yes.
21        Q.    Were they big the entire time that he was
22    yelling and screaming?
23        A.    I can't recall that.  All I could tell is that
24    when he was in the state of mind that he was that he was
```

312 236 6936
877 653 6736
Fax 312 236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

1    becoming -- he was -- it was a threat to everybody,

2    including himself.

3           Q.    Did he ever address any of the officers on the

4    scene?

5           A.    I don't recall.

6           Q.    Because you said he addressed the crowd,

7    right?

8           A.    Well, he was just -- basically it was -- from

9    the best way I could, it was his floor to -- and he was

10   acting out.

11          Q.    Was he addressing anyone specifically in the

12   crowd?

13          A.    No.

14          Q.    So before the back-up officers arrived,

15   Mr. Idris continued yelling and screaming?

16          A.    Pretty much so.

17          Q.    Did you ever see a CTA employee on the scene

18   at any point in time?

19          A.    Yes, I did.

20          Q.    When did you see the CTA employee?

21          A.    Sometime during the middle of the -- Sometime

22   during the incident I saw him.

23          Q.    Where did you see the CTA employee?

24          A.    He was over by the elevator bank.

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 61

1     Q.    Who prepared the criminal complaints?

2     A.    The best of my recollection now, okay, I

3    believe Officer Conway may have given me those

4    complaints.  That's the best of my recollection though.

5    All right.  I can't be certain on that.

6     Q.    Officer Conway gave you those complaints?

7     A.    I believe he did.  Okay.  That's just to my

8    recollection though.

9     Q.    Did he give them to you in the station?

10     A.    Yes, he did.

11     Q.    The complaints that he gave you, were they

12    completed at that time; and by that I mean, did they

13    have text in there for the charge and the narrative?

14     A.    Yes.  Preprinted?

15     Q.    Right.

16     A.    Yes.

17     Q.    So they weren't just blank forms?

18     A.    Right.

19     Q.    Did you know who was going to sign the

20    criminal complaint when you had it on your person at

21    that time?

22     A.    No.

23     Q.    So you saw the CTA employee?

24     A.    Yes.

312 236 6936
877 653 6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 60

```
 1        A.    Yes, sir.

 2        Q.    So you said you went back to the pedway area?

 3        A.    Yes.

 4        Q.    What did you do when you got to the pedway

 5   area?

 6        A.    Tried to identify any witnesses and see if

 7   anyone wanted -- there wanted to sign a complaint.

 8        Q.    Who did you speak with?

 9        A.    I did -- saw a CTA employee.

10        Q.    Where did you see the CTA employee?

11        A.    At the -- Right at the CTA platform area.  You

12   know, the outside of the CTA.

13        Q.    That's by where the ticket booths are?

14        A.    Right.  And I had recognized him from being at

15   the -- him I did recognize was there during the incident

16   with Mr. Idris.

17        Q.    Did you recognize anyone else in that area

18   other than the CTA agent?

19        A.    No.

20        Q.    He was the only person?

21        A.    He was the only one I recognized.

22        Q.    When you went to do an investigation, did you

23   have criminal complaints with you at that time?

24        A.    Yes, I did.
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 71 of 95 PageID #:268

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013
Page 62

1        Q.    Do you know the name of that CTA employee as

2   you sit here today?

3        A.    Only, you know, by looking at the complaint.

4        Q.    If I tell you it was Victor Aponte, does that

5   sound right?

6        A.    That sounds like -- That sounds like it was.

7        Q.    So what did you say to Mr. Aponte?

8        A.    I verified that he was a witness to what

9   happened, to -- that he was a witness when the incident

10  was occurring.  He stated that he felt that Mr. Idris

11  was -- I can't recall the exact phrase, but he was out

12  of control and that the incident -- and confirmed that

13  the incident threw him off his assigned post at the CTA,

14  which was a distraction to the performance of his

15  duties.

16       Q.    Did he say what he did for the CTA?

17       A.    I don't recall.  I don't think -- You know, I

18  knew I was an employee there.  I knew he worked -- No.

19       Q.    Did he say what he was doing immediately prior

20  to observing the incident?

21       A.    I -- No.

22       Q.    Did he tell you what he observed?

23       A.    He told me that he observed that he was out of

24  control and that caused him to come off his post.  So to



Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 64

```
 1   complaints.
 2        Q.    Did he tell you he was willing to press
 3   criminal charges?
 4        A.    Yes, he said -- I said, "Would you sign a
 5   complaint."  I gave him the complaint.  He signed it.  I
 6   gave him the court date, and there was no further
 7   questions and that was it.
 8        Q.    Did you give him a copy of the complaint?
 9        A.    No.
10        Q.    What did you do with the complaint after
11   speaking with Mr. Aponte?
12        A.    I brought it back to the station, handed it
13   over to the officers, and I went upon my duties.
14        Q.    Is there any conversation that you had with
15   Mr. Aponte that we haven't talked about?
16        A.    Not at all.
17        Q.    Did you sign the criminal complaint?
18        A.    No, I don't believe I did.
19        Q.    Why not?
20        A.    As my recollection I can't say exactly why I
21   didn't, but I will probably say it may have been an
22   oversight on my part.
23        Q.    Why do you say it may have been an oversight?
24        A.    Well, it's not signed, so that's the best
```

312.236.6936
877.653.6736
Fax 312 236 6968
www.jensenlitigation.com

JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 73 of 95 PageID #:270

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 77

```
 1    UNITED STATES OF AMERICA        )
      NORTHERN DISTRICT OF ILLINOIS   )
 2    EASTERN DIVISION                )  SS.
      STATE OF ILLINOIS               )
 3    COUNTY OF COOK                  )

 4

 5           I, Kathy J. Szotek, Certified Shorthand

 6    Reporter and Notary Public, do hereby certify that

 7    OFFICER MICHAEL CROOKER was first duly sworn by me to

 8    testify to the whole truth and that the above deposition

 9    was reported stenographically by me and reduced to

10    typewriting under my personal direction.

11           I further certify that the said deposition was

12    taken at the time and place specified and that the

13    taking of said deposition commenced on May 22, 2013, at

14    1:35 p.m.

15           I further certify that I am not a relative or

16    employee or attorney or counsel of any of the parties,

17    nor a relative or employee of such attorney or counsel,

18    nor financially interested directly or indirectly in

19    this action.

20

21

22

23

24
```

312.236.6936
877.653.6736
Fax 312.236.6968
www.jensenlitigation.com


JENSEN
Litigation Solutions

Case: 1:12-cv-06271 Document #: 40-3 Filed: 10/28/13 Page 74 of 95 PageID #:271

Idris vs. City of Chicago
Officer Michael Crooker - 05/22/2013

Page 78

1          In witness whereof, I have hereunto set my

2     hand and affixed my seal of office at Chicago, Illinois,

3     this 24th day of October, A.D., 2013.

4

5

6

7

8                    *Kathy J Szotek*

9

10                    KATHY J. SZOTEK, CSR
                      180 North LaSalle Street
11                    Suite 2800
                      Chicago, Illinois 60601
12                    Phone:   (312) 236-6936

13

14
      CSR No.   084-004657
15

16

17

18

19

20

21

22

23

24

312.236.6936
877.653.6736
Fax 312 236 6968
www.jensenlitigation.com



# **<u>Exhibit G</u>**

## DECLARATION OF JACK PASQUALE

I, Jack Pasquale, declare, under penalty of perjury, that the following facts are true and correct to the best of my knowledge:

1. I have been a member of the Chicago Police Department since June 1992.

2. In January 2012, I was a patrol officer assigned to the O'Hare Airport District, Beat 7263D, and my partner was Officer Tom Driscoll.

3. On January 3, 2012, I was dressed in plainclothes.

4. On January 3, 2012, at or about 3:45 p.m., I was stationed in Terminal 1 when I heard Officer John Conway come over the radio requesting an assist at the 1 W CTA Platform inside O'Hare Airport.

5. Approximately five (5) minutes later, Officer Tom Driscoll and I arrived on scene at the 1 W CTA Platform inside O'Hare Airport.

6. Upon arriving on scene, I observed the individual believed to be Elijah Idris being uncooperative. I could also hear this individual yelling and swearing from approximately 150-200 feet away.

7. At no time on January 3, 2012 did I observe any officer search any citizen at the 1 W CTA Platform inside O'Hare Airport.

8. At no time on January 3, 2012 did I observe any officer seize or arrest any citizen at the 1 W CTA Platform inside O'Hare Airport.

9. At no time on January 3, 2012 did I observe any officer place any citizen into handcuffs at the CTA Platform inside O'Hare Airport. However, upon arriving at the 1 W CTA Platform inside O'Hare Airport, I did observe an individual, believed to be Elijah Idris, in handcuffs.

10. Officers Conway, Moriarty, Driscoll and I escorted an individual, believed to be Elijah Idris, to the police transport vehicle. The individual, believed to be Elijah Idris, continued to yell and swear during this time.

11. At no time on January 3, 2012, did I have any physical contact with the individual in custody believed to be Elijah Idris.

12. The last time I saw the individual believed to be Elijah Idris was when he got into the police transport vehicle outside of Terminal at O'Hare Airport.

13. This concludes my declaration.

1

14. Pursuant to 28 U.S.C. Section 1746, I state under penalty of perjury that the foregoing is true and correct.

Executed on: _11 FEB. 13_

*Jack Pasquale*
Jack Pasquale

Subscribed & sworn to before me
on February 11, 2013.

*Linda G. Jenkins*
Notary Public

```
OFFICIAL SEAL
LINDA G JENKINS
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/04/15
```

2

# **Exhibit H**

# In The Matter of

# ELIJAH IDRIS

# vs.

# OFFICER JOHN CONWAY, et al

# Deposition of
# TREVOR JUSTIN LEWIS, M.D.
# August 20, 2013

**Urlaub Bowen & Associates, Inc.**
**Certified Shorthand Reporters**
**Video Conference Center**
**312-781-9586**
**Fax 312-781--9228**
**info@urlaubbowen.com**
**www.urlaubbowen.com**

```
                 IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                          EASTERN DIVISION

    ELIJAH IDRIS,                   )
                                    )
                 Plaintiff,         )
                                    )
              vs.                   )    No. 12 CV 06271
                                    )
    OFFICER JOHN CONWAY, Star       )
    No. 9524, OFFICER WILLIAM       )
    MORIARTY, Star No. 6316,        )
    and the CITY OF CHICAGO,        )
                                    )
                 Defendants.        )
```

The deposition of TREVOR JUSTIN LEWIS, MD

taken pursuant to the Federal Rules of Civil

Procedure, before Nicole M. Cheney, Certified

Shorthand Reporter No. 084-004744, at 1969 West

Ogden Avenue, Chicago, Illinois, on Tuesday,

August 20, 2013, commencing at 10:59 a.m., pursuant

to notice and subpoena.

        APPEARANCES:

                ED FOX & ASSOCIATES, by
                MR. JONATHAN R. KSIAZEK
                (300 West Adams Street, Suite 330
                 Chicago, Illinois  60606
                 jksiazek@efox-law.com)
                    appeared on behalf of the plaintiff;

Page 2

```
1        APPEARANCES:  (Cont'd)

2              HONORABLE STEPHEN R. PATTON
               CORPORATION COUNSEL, by
3              MS. GAIL L. REICH
               Assistant Corporation Counsel
4              (30 North LaSalle Street, Suite 900
                Chicago, Illinois 60602-2502
5               greich@cityofchicago.org)
                  appeared on behalf of the defendants.

6

7                  *   *   *   *   *   *   *

8                      I N D E X

9
  Witness:                                    Page
10
       TREVOR JUSTIN LEWIS, MD
11
               Examination by:
12
                  Ms. Reich....................    3
13                Mr. Ksiazek.................    71
                  Ms. Reich...................   76
14

15

16                 E X H I B I T S

17  No.   Description               Marked/Referenced

18    1  Curriculum Vitae.......................  5
      2  Records...............................  11
19    3  Records...............................  11
      4  Photographs...........................  68
20

21          (Exhibits attached/scanned.)

22                    -  -  -

23

24
```

1                    (Deposition Exhibit No. 1,

2                     Witness Lewis, was marked for

3                     identification 08/20/2013.)

4                    (Witness sworn.)

5        MS. REICH:  Good morning, Doctor.  My name is

6 Gail Reich.  I represent the City of Chicago and

7 the Chicago police officers --

8        THE WITNESS:  Okay.

9        MS. REICH:  -- whom are named as defendants

10 in a lawsuit filed by a gentleman by the name

11 Elijah Idris.

12              We are here for the deposition of

13 Dr. Trevor Lewis, taken pursuant to notice and

14 subpoena, pursuant to the Federal Rules of Civil

15 Procedure, and those of the Northern District of

16 Illinois.

17              TREVOR JUSTIN LEWIS, MD

18 called as a witness herein, having been first duly

19 sworn, was examined and testified as follows:

20                    EXAMINATION

21 BY MS. REICH:

22        Q.    Could you please state and spell your

23 name for the record, including your middle name, if

24 any?

1     A.    Some of the presentations that are

2 given here and some of them are national

3 presentations for -- in field.

4     Q.    Okay.  Emergency medicine?

5     A.    Yes.

6     Q.    Okay.  Ah, national presentations as

7 well.  Okay.  Thank you.

8           Okay.  During your course as an

9 emergency physician, have you had occasion to

10 attend to people who have been brought in by

11 the Chicago police?

12    A.    Yes.

13    Q.    Okay.  And forgive me for asking, have

14 you ever been arrested yourself?

15    A.    No.

16    Q.    Okay.  And these people come in

17 accompanied by the police and they're in custody?

18    A.    Yes.

19    Q.    Okay.  All right.  I see you have some

20 records that -- in front of you as well --

21    A.    Yes.

22    Q.    -- that you brought with you.

23           Are those records of Elijah Idris?

24    A.    Yes.

1     Q.     May I see them?

2     A.     Yes.

3     Q.     Are these records that you've reviewed
4 in order to refresh your recollection regarding
5 this patient?

6     A.     Yes.

7     Q.     Okay.  What was your role with respect
8 to Elijah Idris on January 9th, 2012?

9     A.     I was the attending physician who was
10 on staff for the area that he was seen in of the
11 emergency department.

12     Q.     And what would that -- in terms of
13 being the attending physician, what role then do
14 you play in terms of the care for the patients
15 there?

16     A.     You have a supervisory role in those
17 areas.

18     Q.     Okay.

19     A.     It could involve either direct patient
20 contact, but you don't directly see all patients.

21     Q.     Is there any way that you can determine
22 from looking at those records whether you had
23 direct contact with Mr. Idris in January of 2012?

24     A.     Yes.

1 department today?  Why are you here?  What's your

2 chief complaint?  And they try to explain that

3 chief complaint in a little more detail.

4       Q.    And I assume then the doctor continues

5 to ask more questions based on the information

6 that's given by the patient?

7       A.    Yes.

8       Q.    And History of Present Illness, is that

9 all information that's subjectively given by the

10 patient?

11      A.    Yes.

12      Q.    Okay.  It contains no information that

13 comes from the doctor based on objective

14 observations?

15      A.    No.

16      Q.    Okay.

17      A.    You're asking them to tell you the

18 story of what brings you here.  And then you'll

19 make your observations later.

20      Q.    Okay.  And in this case, what did --

21 based on the records, what did Mr. Idris tell

22 Dr. Magenis?

23      A.    Reading from PA Magenis's note:  The

24 patient presents with right wrist pain, wrist

1 swelling.  The course of the symptoms is constant.

2             You want me to read this?

3     Q.    Yes.  And I'll ask you some questions

4 along the way.

5             The course of the symptoms is

6 constant, what does that refer to?

7     A.    The way that these are set up is when

8 you look at our computerized form, there are

9 several sections.  And so the way it is set up is

10 for billing purposes and to take a history of

11 present illness, there's about seven modifiers that

12 are in that history.  It's based on billing.

13            So course, duration, intensity, all

14 those things are asked about.

15    Q.    Okay.

16    A.    So you'll see on some of these things,

17 the course that -- something that the resident will

18 check and write something in.  So they'll go

19 through several of those prompts, and then they

20 usually write something in at the end that's a

21 little more free text.

22    Q.    Okay.  So course or duration, that

23 means the -- the symptoms are -- have been going on

24 consistently for the whole time?

1      A.     Yes.

2      Q.     Thank you.

3             Please continue.

4      A.     Type of injury:  Crush injury and

5 status post being handcuffed at the airport.

6             The location where the incident

7 occurred was at home.

8             Location:  Right wrist.

9             The character of the symptoms is

10 pain and swelling.

11            The degree of the pain is moderate.

12 The degree of the swelling is minimal.

13            The exacerbating factor is

14 palpation.

15            The patient's dominant hand is the

16 right hand.

17            Prior episodes:  None.

18            Associated symptoms:  Denies

19 tingling, denies numbness, denies suspected foreign

20 body, denies fever, denies cough, denies head

21 injury, and denies injury.

22            Patient is a 39-year-old man who,

23 after being handcuffed at the airport, has residual

24 pain and swelling in the dorsal aspect of his wrist

1 blood pressure, et cetera.  And then you start your

2 physical exam.

3       Q.     Okay.  And so once the physical exam

4 begins, those are objective observations made by

5 PA Magenis?

6       A.     Yes.

7       Q.     Okay.  And so what can you tell me

8 about the examination done by PA Magenis?

9       A.     So what was pulled into the physical

10 exam are the vitals that were done out in triage;

11 the weight of the patient, which could have been

12 from previous visits; his oxygen level.

13               And then on the physical exam, in

14 general, the patient was alert.

15               He did an observation of the

16 patient's skin.  It was warm, dry, and intact.

17               He listened to the patient's heart.

18 There was a regular rate and rhythm; no murmur.

19               Normal perfusion.

20               Respiratory exam was in the lungs.

21 They were clear to auscultation.  Respirations are

22 non-labored; breath sounds are equal.

23               Examined the abdomen:  Soft,

24 nontender, non distended, normal bowel sounds.

1                    Musculoskeletal, comments on normal

2 range of motion, normal strength.

3                    Let's see.  Distal upper extremity:

4 Right distal wrist, aligned, tenderness, swelling,

5 no abrasion, no erythema, no ecchymosis, no

6 snuff-box tenderness.  Hand:  Right, aligned, no

7 tenderness, no swelling.

8        Q.    Okay.  So up to this point, the vital

9 signs back on the prior page, are those all within

10 normal range?

11       A.    Yes.

12       Q.    Okay.  Everything else up to the

13 musculoskeletal examination, is that all normal?

14       A.    Yes.

15       Q.    Okay.  So let's talk about that

16 musculoskeletal examination.

17                    So based on PA Magenis's examination,

18 there was a normal range of motion for Mr. Idris's

19 wrist?

20       A.    Yes.  That's what it looks like.

21       Q.    Okay.

22       A.    That's what he wrote:  Normal range of

23 motion, normal strength.

24       Q.    Okay.  Normal strength.  Okay.

1          Distal upper extremity refers to --

2 is that still the back top of the wrist or ...

3     A.    I'm assuming.  When you say distal

4 upper extremity, it's upper extremity being the

5 arms.

6          Distal, hands and wrist is what I

7 would interpret that as.

8     Q.    Okay.  So does this mean -- aligned

9 means there's nothing -- you should say it because

10 me interpreting is not a great way to do it.

11    A.    Aligned is based on visual inspection

12 and palpation, that everything appears to be in its

13 normal anatomic position.

14    Q.    Okay.  And then tenderness and

15 swelling, that's what Magenis observed?

16    A.    On his exam.

17    Q.    Okay.  As well as -- no abrasion

18 meaning no cuts or --

19    A.    No break of the skin.

20    Q.    No break of the skin.  Okay.

21          What's that next word?

22    A.    No erythema.

23    Q.    And that means?

24    A.    That's redness.

1      Q.     Okay.  And what were those observations?

2      A.     Patient seen and examined with PA

3  Magenis.  Right distal radial swelling and pain

4  after being handcuffed.  X-ray was negative for

5  fracture.  Reassured and educated on contusion.

6  Discharged home.  Christine Stehman, MD.

7      Q.     Okay.  Is that anything different than

8  what we've already talked about?

9      A.     No.

10      Q.     Okay.  And so ultimately, their

11  diagnosis is what?

12      A.     Diagnosis is entered as:  Contusion of

13  the wrist.

14      Q.     And what is a contusion?

15      A.     Contusion is when you have swelling of

16  the soft tissue.  It doesn't involve a fracture of

17  the bone.

18      Q.     Is there any way to tell how long a

19  contusion could last, for example?

20      A.     No.  Variable.  It depends on the area

21  and maybe the intensity of the contusion.

22      Q.     Okay.  Based on the records, can you

23  make any -- can you give any opinion about how long

24  this contusion would have lasted?

Page 54

1      A.    Hard to give an opinion.

2      Q.    Okay.  Once this diagnosis of contusion

3 of the wrist was made, then what happened next?

4      A.    Then you can see the resident documents

5 their plan.  Their condition improved.  Disposition,

6 they're discharged at 5:45 to home.  And they were

7 given a prescription for ibuprofen, 400 milligrams.

8 And their follow-up was in ASC as needed.

9      Q.    What's ASC?

10     A.    Ambulatory screening clinic.

11     Q.    So it's to come back?

12     A.    Right.  Everybody has to -- everybody

13 gets follow-up.  And so if things worsen or change,

14 they then are instructed to follow up in our

15 ambulatory screening clinic.

16     Q.    And so that's what Mr. Idris was told

17 then, just if something gets worse or you have more

18 pain, then come back to us?

19     A.    We give that to everybody --

20     Q.    Okay.

21     A.    -- if things worsen or change; that's

22 the standard.  The ED discharge.

23            And then the ASC is more -- you

24 maybe want to start seeing a physician regularly or

```
1 STATE OF ILLINOIS    )
                       )  SS:
2 COUNTY OF C O O K    )

3       I, Nicole M. Cheney, do hereby certify that
  TREVOR JUSTIN LEWIS, MD, was duly sworn by me to
4 testify the whole truth, that the foregoing
  deposition was recorded stenographically by me and
5 was reduced to computerized transcript under my
  direction, and that the said deposition constitutes
6 a true record of the testimony given by said
  witness.
7
        I further certify that I am not a relative or
8 employee or attorney or counsel of any of the
  parties, or a relative or employee of such attorney
9 or counsel, or financially interested directly or
  indirectly in this action.
10
        IN WITNESS WHEREOF, I have hereunto set my
11 hand and affixed my seal of office at Chicago,
   Illinois, this 7th day of October 2013.
12

13

14
               Illinois CSR No. 084-004744
15

16

17

18

19

20

21

22

23

24
```

# **<u>Exhibit I</u>**

| 23-2 | 29 FEB 12/ 9:00AM | CPD/050 |
|---|---|---|
| (Court Branch # or District #) | (Court Date/Time) | (Arresting Agency #) |

**MISDEMEANOR COMPLAINT** (This form replaces CCG-0655 , CCMC-0222 & CCMC-0225)          (Rev. 12/7/00) CCCR 0655

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                            **Plaintiff**

v.

       IDRIS, Elijah K.

                       **Defendant.**

NO.    **12203459**

MC-Br.50
JAN 10 2012
DOROTHY BROWN
CLERK OF THE CIRCUIT COURT

*Victor Aponte CTA #48208*

complainant, now appears before
(Complainant's Name Printed or Typed)

The Circuit Court of Cook County and states the following:

That: _____ IDRIS, Elijah K. _____ of _____ 5129 S. HARPER AVE _____ has, on or about
      (defendant)                          (address)

_____ 03 Jan 12 _____ at the location of _____ 1 W. CTA PLATFORM CHICAGO, IL COOK CO. _____
     (date)                                   (place of offense)

committed the offense(s) of _____ DISORDERLY CONDUCT _____

IN THAT HE DID KNOWINGLY AND INTENTIONALLY BECAME BELLIGERENT, THROWING HIS BAGS TO THE GROUND WHILE SHOUTING PROFANITIES AND WAVING HIS ARMS IN THE AIR WITH CLENCHED FISTS, CAUSING PASSENGERS AND EMPLOYEES TO BACK UP IN THE PEDESTRIAN CORRIDOR AND A CROWD TO GATHER IN SUCH AN UNREASONABLE MANNER AS TO ALARM AND DISTURB SAID PASSENGERS AND EMPLOYEES, PLACING THEM IN FEAR FOR THEIR SAFETY AND PROVOKE A BREACH OF THE PEACE.

in violation of _____ 720 _____ Illinois Compiled Statutes _____ 5 _____ / _____ 26-1(a)(1) _____
          (Chapter)                              (Act)             (Sub Section)

**AOIC Code**

| | | | | | | |
|---|---|---|---|---|---|---|
| | | | | | | |

_____
(Complainant's Signature)

*2 W CTA Platform*
(Complainant's Address)

*Victor Aponte*    773.772.8043
(Complainant's Telephone)

**STATE OF ILLINOIS** } ss:
**COOK COUNTY**

_____
(Complainant's Name Printed or Typed)

The complainant, being first duly sworn on oath, deposes and says that he/she read the foregoing complaint by him/her subscribed and that the same is true.

_____
(Complainant's Signature)

Subscribed and sworn to before me on this _____ 03 _____ day of _____ JANUARY _____ , 2012

                                D. BROWN /
                                         (Judge or Clerk)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,** Judge _____
    **or**                                                   Judge's No.

**WARRANT ISSUED,** Bail set at: _____
    **or**

**BAIL SET AT:** _____ Judge _____
                                                           Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IDRIS 12 C 6271
FCRL 00007